IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**TERESA K. CORKILL,**

       **Plaintiff,**

v.                                           Case No. 3:04cv115/RV/MD

**HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,**

       **Defendant.**
_____/

**ORDER**

Plaintiff Teresa K. Corkill brought an action in this court pursuant to Title 29, United States Code, Section 1132, for violation of the Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. §§ 1001 et seq.] based on a denial of disability benefits by Defendant Hartford Life and Accident Insurance Company. Pending is the Defendant's motion for summary judgment. (Doc. 27). Unless otherwise noted, the following facts appear to be undisputed.

**I.     FACTUAL BACKGROUND**

Hartford Life and Accident Insurance Company ("Hartford") is the claims administrator for a long-term group disability policy ("policy") issued to SRA International, Inc. ("SRA") and governed by ERISA. The policy provides long-term disability benefits to eligible participating employees of SRA. The policy is administered by the plan administrator with benefits provided in accordance with the provisions of the policy. The policy gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the

policy. (Policy, at H-00644).

> According to the provisions of the policy, "disability" is defined as meaning:
> …that during the Elimination Period and for the next 24 months you are prevented by:
> (1) accidental bodily injury…
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

The policy also requires that an applicant "must be so prevented from performing one of more of the Essential Duties of Any Occupation" to qualify as disabled. (Policy, at H-00646).

Teresa K. Corkill worked full time as an analyst at SRA for a little over one year: from February 26, 2001 to April 12, 2002. On April 12, 2002, Corkill was involved in an automobile accident and taken to the emergency room of the U.S. Navy Hospital in Pensacola, where she was prescribed Flexeril and released. Corkill returned to work part time on April 18, 2004. On April 19, 2004, she saw her family doctor, Dr. Allen Winston, complaining of neck pain, back pain, and headaches. Dr. Winston examined Corkill, and found that she had rigidity in the neck, decreased range of motion, and paravertebral muscle fullness near the back and trapezius areas. He prescribed Ibuprofen and Skelaxin, and recommended physical therapy. At a follow-up visit on April 24, 2002, Corkill indicated that her headaches were gone, but that she continued to feel neck pain and now had numbness in both hands. Dr. Winston examined Corkill, noting that while Corkill had a full range of motion in her neck, she was experiencing increased paravertebral muscle fullness and rigidity in the neck. Dr. Winston prescribed Flexeril and Lortab, and ordered physical therapy three times a week for two weeks. Corkill participated in physical therapy until June of 2002, at which point it was discontinued.

Dr. Winston also ordered a MRI, which was performed at the Navy Hospital on May 13, 2002. The MRI show showed mild reversal of the cervical lordotic curvature, a minimal narrowing of the right neural foramen due to osteophyte formation at the

C4-5 level, minimal dorsal spondylitic ridging at the C5-6 level, and  mild narrowing of the right neural foramen by an incontrovertible osteophyte formation at the C6-7 level. No disc herniations, bulges, protrusions or nerve root compressions are noted on the report.

On May14, 2002, Dr. Winston restricted Corkill from working for ten days, on the basis of the Plaintiff's complaint that she "doesn't feel she could work" because of pain.  She returned to work part time, working four hours a day, on May 24, 2002.[1] Corkill made numerous visits to Dr. Winston over the course of the following year, complaining of neck and back pain. Dr. Winston continued to prescribe pain medication for these symptoms, and restricted Corkill to light duty working part time. Dr. Winston also ordered physical therapy, steroid injections, nerve blocks, and other treatments, all of which proved ineffective. After visiting Dr. Winston in August, the Plaintiff was returned to full time work on August 28, 2002. On October 31, 2002, Plaintiff requested that Dr. Winston reduce her work to three hours per day, and he did. On January 8, 2003, Dr. Winston stated that Corkill had reached maximum medical improvement and indicated that Corkill could only do sedentary work four hours a day, three to five days a week.

In addition to Dr. Winston, Corkill consulted two other physicians during this time. Corkill saw Dr. Gregory Staviski, a pain management specialist, on several occasions beginning in July of 2002. After taking Corkill's history and performing a neurological examination with normal results, Dr. Staviski diagnosed Corkill as suffering from cervical spondylosis without myelopathy secondary to a flexion extension injury; in layman's terms, whiplash. Corkill also saw Dr. Robert Feldman, a neurosurgeon, on October 7, 2002. Dr. Feldman evaluated Corkill's prior x-rays and MRI, and also conducted a physical and neurological examination. The neurological exam showed a moderate bilateral trapezius and intrascapular spasm, and mild

---

[1] According to records submitted as part of her disability claim, the number of hours Corkill worked during this period tended to fluctuate, ranging from 50 to 11 hours per two-week period.

paracervical spasm. The MRI also showed straightening of the cervical lordosis. Dr. Feldman concluded that Corkill was suffering from a cervical sprain resulting from the accident, and that straightening of the cervical lordosis was causing the majority of the pain. Dr. Feldmand also concluded that Corkill's condition could not be corrected by  surgery.

Corkill applied for long term disability benefits in April of 2003. In support of her claim, she submitted her application materials: an April 3, 2003, Attending Physician Statement by Dr. Staviski; medical records from Dr. Staviski, Dr. Winston, and Dr. Feldman; and records from O'Steen Chiropractic Clinic. Hartford sent these medical records to the Medical Advisory Group ("MAG") for an independent medical review, and authorized MAG to contact Corkill's physicians in order to determine why they did not feel she could return to work on a full-time basis at the end of May 2002.

Dr. F. B. Dibble, Jr. was assigned by MAG to the case. After reviewing Corkill's file and discussing her case with Dr. Winston, Dr. Dibble submitted a written report to Hartford on May 30, 2003. The report concluded that Corkill suffered from chronic pain syndrome in connection with her neck injury. According to the report, Dr. Dibble contacted Dr. Winston, who agreed that there were no objective findings immediately after the accident that should have prevented Corkill from returning to work by the end of May 2002.[2] The report also concluded that the medical records did not reveal any abnormal orthopedic or neurological finding as a result of the injury sustained in Corkill's accident, and no objective findings immediately after the accident that would have prevented Corkill from returning to work by the end of May 2002.

Hartford denied Corkill's benefits application by letter on June 4, 2003. Hartford based its decision on all the medical information in the claim file, including the medical records review conducted by Dr. Dibble. Plaintiff appealed this decision on July 17, 2003. As part of this appeal, Corkill supplied Hartford with some additional medical

---

[2] The Plaintiff denies that Dr. Winston made any such representations, but the record reflects no disputed material fact regarding this.

records relating to her case.

On October 28, 2003, Corkill started to see Dr. An T. Duong as her family physician. Apparently Dr. Winston was leaving his practice and Corkill needed a new family doctor. Dr. Duong completed an "Assessment of Physical Residual Functional Capacity" for Corkill, which indicated that she could walk, stand, and sit for only four hours of each eight hour work day, that she could lift less than five pounds frequently, less than 20 pounds occasionally, but never more than 25 pounds. Dr. Duong did not restrict Corkill from climbing stairs or ladders, bending, or fine/gross manipulation. Another "Assessment of Physical Residual Functional Capacity" completed by Dr. Staviski provided similar results.

On February 27, 2004, Hartford referred Corkill's medical records to the University Disability Consortium ("UDC") for an additional independent medical review of Corkill's medical records. UDC assigned Dr. Brian Mercer, a board certified neurologist, to conduct the medical record review. He was asked to analyze the Plaintiff's functional capability, her pain complaints, the objective medical evidence, and any limitations due to medication. In the course of making this review, Dr. Mercer contacted Dr. Staviski, who he claims told him: (a) that Corkill had a diagnosis of cervical muscle spasm, (b) that she did not have any significant cervical spondylosis, cervical radiculopathy, or facet arthropathy; (c) that her subjective symptoms exceeded the objective findings; and (d) that she appeared to be capable of functioning at a full-time sedentary or light level job.[3] These representations were memorialized in a letter by Dr. Mercer to Dr. Staviski signed on March 9, 2004. No response from Dr. Staviski is in the record. After reviewing the medical records in the case, Dr. Mercer concluded that:

> Based upon the limited objective findings of spasm in the cervical region, the intermittent presence of normal cervical range of motion, the absence of any neurological abnormalities or radiculopathy, and the relatively

---

[3] The Plaintiff denies that Dr. Staviski ever made any such representations, but the record reflects no disputed material fact regarding this.

> benign cervical MRI scan findings; the medical records do not include any objective information that would have precluded full-time functioning at least at sedentary level beginning on approximately 6/5/02 and onward. It is likely that by the late summer of 2002, she could have functioned at a light level. From 4/12/02 through approximately 6/5/02, full-time sedentary functionality was not likely. The degree of ongoing reported pain exceeds the objective findings. Although Ms. Corkill reports difficulty with concentration which she attributes to medication, the medical records that are legible do not outline any significant ongoing side effects from medication.

After reviewing the documents and evidence in the claim file, Hartford upheld its denial of benefits under the policy on March 18, 2004. Hartford provided the following summary rationale for its decision:

> In order to be eligible for benefits[,] satisfactory proof of continued disability throughout and beyond the 90 day elimination period has to be provided. A medical review finds that as of 6/5/02 you were capable of full time sedentary work. Your occupation as required to be performed by your employer is consistent with sedentary work. It is our determination that satisfactory proof of continued Disability throughout and beyond the 90 day Elimination Period has not been provided. Therefore, we are upholding the denial of your claim.

Corkill filed this action on April 1, 2004.

## II.     DISCUSSION

### A.     Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986);

see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

B. ERISA

Under Title 29, United States Code, Section 1132(a)(1)(B), a participant or beneficiary of an employee benefit plan may initiate civil proceedings to recover benefits due under the terms of the plan. In an ERISA benefits case, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, and it reviews the plan administrator's determination in light of the record compiled before the plan fiduciary. Leahy v. Raytheon, 315 F.3d 11 (1st Cir. 2002); Perry v. Simplicity Eng'g, 900 f.2d 963 (6th Cir. 1990). ERISA claims are not triable before a jury. Blake v. Unionmutual Stock Life Ins. Co. Of America, 906 F.2d 1525 (11th Cir. 1990). A judge in a nonjury case is entitled to draw inferences and conclusions from undisputed evidentiary facts. Coats & Clark v. Gay, 755 F.2d 1506 (11th Cir. 1985); Nunez v. Superior Oil, 572 F.2d 1119 (5th Cir. 1978).

Case No.: 3:04CV115/RV/MD

ERISA does not provide the standard of review for decisions of a plan administrator. Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702 (11th Cir. 1995). However, the Eleventh Circuit has developed a three level standard to govern review of ERISA claims: (1) de novo review where the plan does not grant the administrator discretion; (2) arbitrary and capricious review where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious review where there is a conflict of interest. See, e.g., HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982 (11th Cir. 2001).

The appropriate standard of review in this case is highly contested by the parties. Both parties concede that the policy grants Hartford discretion to determine benefits claims, and thus de novo review is not appropriate. As a self-funded provider, Hartford has a conflict of interest, which means that the heightened arbitrary and capricious standard applies to its legal determinations. See Brown v. Blue Cross & Blue Shield, 898 F.2d 1556 (11th Cir. 1990). In the Eleventh Circuit, a burden shifting approach applies in heightened arbitrary and capricious cases. First, a court must determine whether the claims administrator's decision was "wrong" from a de novo standpoint.[4] HCA, supra, 240 F.3d at 993. If the claim administrator's decision was "right", that ends the court's analysis. If the court concludes that the decision was "wrong", it then asks whether reasonable grounds exist in the record to support the defendant's decision. Williams v. Bellsouth Telecommunications, 373 F.3d 1132 (11th Cir. 2004). Even if the court finds reasonable grounds for the administrator's wrong decision, the analysis does not end there.[5] The burden then shifts to the defendant to prove that its decision was not tainted by self-interest. Brown, supra,

---

[4] "Wrong" is the label used by the Eleventh Circuit to describe the conclusion a court reaches when, after reviewing the plan documents and the administrative record, the court disagrees with the claims administrator's decision. HCA, supra, 240 F.3d at 993, n. 23; Yochum v. Barnett Banks, Inc., 234 F.3d 541 (11th Cir. 2000).

[5] Thus, both a de novo and an arbitrary and capricious review are required as components of the heightened arbitrary and capricious review.

898 F.2d at 1561. Only if it can persuasively demonstrate this will its decision be affirmed. Id.

Hartford denies that this burden shifting approach applies to the factual conclusions of a claims administrator, as distinct from its legal findings. Instead, it argues that a pure arbitrary and capricious standard applies. In support of this position, the Defendant cites Thomas v. Lockheed Martin Information Systems, 155 F. Supp. 2d 1316 (N.D. Fla. 2001), a decision of this court in which I concluded that the burden shifting analysis in the heightened arbitrary and capricious standard of review should not apply to factual determinations. Id., at 1326. In that case, I noted that applying the burden shifting analysis to a claims administrator's factual determinations would place an inappropriately high burden on defendants in ERISA cases. Id., at 1324 n. 8 ("[i]f there is a presumption against the plan administrator, the burden of overcoming that presumption seems to be greater than under a de novo standard of review…. [A] thoughtful reader may well wonder how this 'heightened' standard retains any resemblance to an arbitrary and capricious standard.").

Subsequent to my decision in Thomas, the Eleventh Circuit has addressed this issue further in several cases. Unfortunately, these cases do not serve to clarify the matter in any significant fashion. In Shaw v. Connecticut General Life Insurance, 353 F.3d 1276 (11th Cir. 2003), for example, the Eleventh Circuit seemed to assume that a claims administrator's factual determinations were subject to the same level of review as its legal determinations. Id., at 1285 ("our Court has already declined to draw a distinction between law and fact in choosing the standard of review for denial of ERISA benefits."); see also Torres v. Pittson Co., 346 F.3d 1324 (11th Cir. 2003); Levinson v. Reliance Standard Ins. Co., 245 F.3d 1321 (11th Cir. 2001). Yet, in the subsequent case of Williams v. Bellsouth Communications, supra, the court indicated that the issue had not been resolved. See Williams, supra, 373 F.3d at 1138-39 ("In both Shaw and Levinson, two factual-determination cases, we did not say whether Brown's 'heightened arbitrary and capricious' burden-shifting approach should be applied to factual determinations cases").

While I am still inclined to agree with my earlier analysis in Thomas, it is not necessary for me to resolve the issue here. As discussed above, regardless of what type of review is ultimately applied, a court must begin by applying a *de novo* standard of review. HCA, supra, 240 F.3d at 993. It is only when a court concludes that a claim administrator's decision was "wrong" *de novo* that either the arbitrary and capricious or the special "heightened" arbitrary and capricious standards come into play. Williams, supra, 373 F.3d at 1138.

Corkill was diagnosed by her treating physicians as suffering from chronic neck pain, which rendered her unable to work. However, from the record it appears that these diagnoses were based almost entirely on Corkill's own subjective complaints of pain, rather than on any objective evidence of disability. A claims administrator is not required to defer to a plaintiff's subjective complaints of pain.  See Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376 (6th Cir. 1996). In this case, two independent medical reviewers, after consulting with Corkill's treating physicians, concluded that the objective evidence did not support a finding that Corkill was totally disabled under the terms of the policy.  After reviewing the record, I agree with this conclusion and find that Hartford's decision was "right."

In her memorandum opposing summary judgment, Corkill contends that there is objective evidence in the record supporting a finding of disability. In particular, she points to the examination of Dr. Feldman, which found objective evidence of mild to moderate muscle spasms and a straightening of the cervical lordosis. According to Corkill, these findings show that Corkill was not faking her injuries. The test here, however, is not whether Corkill is "faking" her injuries. The test is whether, based on the evidence in the record, Corkill can show that she was unable to perform the essential duties of her job or of any other job paying at least 80% of her pre-disability earnings. This is a high standard. Simply proving that Corkill is in some pain, treatable by pain medication, does not show that the pain is so debilitating that she is unable to function in any occupation. A fair reading of the evidence is that the Plaintiff was able to do full time sedentary work after approximately June 5, 2002.

Corkill also argues that Dr. Winston and Dr. Staviski did not make the statements attributed to them in Dr. Dibble's and Dr. Mercer's reports acknowledging that there was no objective evidence of Corkill's total disability. Even if true, this argument is largely immaterial to the outcome of this case. What matters is not whether Corkill's treating physicians acknowledged that there was no objective evidence of total disability in the record, but rather whether there was, in fact, any such objective evidence in the record. Further, Corkill has offered no contrary evidence on the issue, such as an affidavit from Dr. Winston or Dr. Staviski denying the statements and identifying objective evidence in the record that would raise a genuine issue of material fact. Simply alleging that the statements were never made is not sufficient to create a genuine issue of material fact.

Here, Hartford called in two separate independent medical reviewers. One of them is a board certified neurologist. Both of them not only reviewed the record evidence, but also spoke personally with an attending physician. Hartford reasonably relied on their analysis. Its decision was not "wrong."  Even if I were of the opinion that its decision was not what I considered to be the "right" decision, Hartford's decision is fully supported in the record by substantial competent evidence and was not arbitrary and capricious.  Further, its use of independent medical reviewers in a thorough review process establishes that its decision was not improperly tainted by any self interest.

### III.   CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (Doc. 27) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.  No costs shall be taxed.

DONE and ORDERED this 28th day of April, 2005.

/s/ *Roger Vinson*
**ROGER VINSON**
**Senior U.S. District Judge**